IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
CELLULAR TELEPHONE 978-305-2589
THAT IS STORED AT PREMISES
CONTROLLED BY SPRINT.

No.  20-mj-154-01-AJ

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, John R. Cook, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Sprint, an electronic communications service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Sprint to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed for over fifteen years.  During that time, I successfully completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training, at the Federal Law Enforcement Training Center in Glynco, Georgia.  Prior to that, I was employed as a police officer for the city of Lexington, Kentucky for approximately five years.  I am also a graduate of the University of

Kentucky with both a bachelor's and master's degree and served in the United States Marine

Corps Reserve for eight years.  During my career in law enforcement, I have conducted

numerous criminal investigations, like the present one, into firearms trafficking, and the unlawful

possession of firearms/ammunition.

3.     This affidavit is based upon my experience and training as a Special Agent of the

ATF, my personal participation in the investigation, my review of ATF records, my review of

reports prepared and maintained by local and state agencies, and information provided to me by

other law enforcement officials.  This affidavit is intended to show only that there is sufficient

probable cause for the requested warrant and does not set forth all of my knowledge about this

matter.

4.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of Title 18, United States Code, Section

922(a)(6) and Title 18, United States Code, Section 924(a)(1)(A) have been committed by Judy

MCFADDEN and/or Tyrone YOUNG.  There is also probable cause to search the information

described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further

described in Attachment B.

**RELEVANT STATUTES**

5.     Under Title 18, United States Code, Section 922(a)(6), it is illegal for any person,

"in connection with the acquisition or attempted acquisition of any firearm or ammunition from a

. . . licensed dealer . . . knowingly to make any false or fictitious oral or written statement . . .

intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any

fact material to the lawfulness of the sale."  Whether a person is the actual transferee/buyer of the

firearm at issue, and the person's address, are both facts material to the lawfulness of the sale.

2

Under Title 18, United States Code, Section 924(a)(1)(A), a person who "knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter" shall be fined, imprisoned for not more than five years, or both.

**JURISDICTION**

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the United States District Court for the District of New Hampshire is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.      On June 29, 2020, I spoke with Nick D'Augustine, owner of Milford Firearms, a federally licensed firearms dealer located at 286 Elm Street Milford, New Hampshire. I had been alerted by the New Hampshire State Police Gun Line that D'Augustine wanted to report his suspicion that Judy MCFADDEN (DOB 08/27/1992) was attempting to straw purchase multiple firearms (that is, unlawfully purchase them on behalf of another person). When I spoke to D'Augustine, he advised that he became suspicious of MCFADDEN on June 26, 2020, when she came into his store and casually said that if she was approved for the firearm she was attempting to purchase, then she would buy an additional three firearms the next day. D'Augustine thought it was strange someone would casually add an additional three firearms to their purchase. Further, D'Augustine stated that MCFADDEN had stated that she had already recently purchased multiple firearms from Old Glory Guns & Ammo (781 Fitchburg Road Greenville, NH). In addition, D'Augustine advised that during the transaction, MCFADDEN was constantly

3

on her phone or looking at her phone and that D'Augustine believed MCFADDEN was communicating with another person. D'Augustine told me that it was his impression that MCFADDEN was attempting to straw purchase firearms.

8.      On June 29, 2020, I contacted Old Glory Guns & Ammo and requested a summary of all of Judy MCFADDEN's purchase history. The following purchases were noted:

   a.   June 3, 2020 – Ruger model EC9S 9mm pistol with serial number 457-44106.

   b.   June 5, 2020 – Smith & Wesson model M&P 350 .380 caliber pistol with serial number NFK0380.

   c.   June 16, 2020 – Ruger model PC Charger 9mm pistol with serial number 91306170 and a Ruger EC9S 9mm pistol with serial number 457-64424.

   d.   June 18, 2020 – Ruger model PC Charger 9mm pistol with serial number 913-07152.

   e.   June 28, 2020 – Ruger model Security 9 9mm pistol with serial number 383-41515.

9.      For each of these purchases, MCFADDEN completed an ATF Form 4473, Firearms Transaction Record. Question 11(a) of the Form 4473 asks, "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.**" On each of the forms, MCFADDEN checked "Yes" to affirm that she was the actual transferee/buyer of the firearms. She also listed on each Form 4473 an address of 219 Walnut Street #2 Manchester, New Hampshire.

10.     Also, Old Glory Guns & Ammo advised that MCFADDEN provided a telephone number of 978-305-2589, which was documented on the top of several of the ATF Forms 4473 completed by MCFADDEN. Accurint, a commercial database of public records, advised that 978-305-2589 is a cellular phone associated with the carrier Sprint.

11.     On June 29, 2020, I went to the address MCFADDEN listed on her completed ATF Form 4473, 219 Walnut Street #2 Manchester, New Hampshire. At that location, I spoke to a Tyler McWalter who advised that he had lived at that residence for six months and did not know anyone named Judy MCFADDEN.

12.     Further query of Accurint indicated that MCFADDEN had utilities connected in her name on May 7, 2020 at 729 Somerset Avenue #1 in Taunton, Massachusetts.

13.     On June 29, 2020, I contacted the New Hampshire State Police Gun Line via e-mail and advised them to "Deny" MCFADDEN's purchase that was pending with Milford Firearms. According to Milford Firearms, they never received that denial response from the New Hampshire State Police Gun Line.

14.     On July 7, 2020, MCFADDEN purchased two additional firearms from Milford Firearms, which were described as a Ruger EC9S 9mm pistol with serial number 457-58388, and a Springfield model XD-9 9mm pistol with serial number AT215160. That transfer was allowed when, according to Milford Firearms, they did not receive a background response from the New Hampshire State Police Gun Line within three business days. Again, MCFADDEN affirmed that she was the actual transferee/buyer of the firearm, and listed her address as Walnut St. in Manchester.

15.     In summary of the above purchases, MCFADDEN had purchased eight (8) pistols between June 3, 2020 and July 7, 2020. Of those pistols, five were duplicate makes and models.

5

16.     On July 16, 2020, I interviewed Dana Ryll, owner of Old Glory Guns & Ammo, about MCFADDEN's purchases. Ryll advised that when MCFADDEN first came into the store over a month ago, two unknown black males accompanied her. Ryll stated that he was not sure of the exact date when MCFADDEN came into the store and that the video from that timeframe was no longer available. Ryll told me that he recalls MCFADDEN because one of the men she was with had baggy pants that were hanging down so low that part of his buttocks was showing. When Ryll asked the man to pull up his pants because families were in the store, the man responded that Ryll should just stop looking. Ryll said he did not wish to escalate the situation, so he just broke off the conversation. Regardless, Ryll advised that he believes MCFADDEN did not purchase any firearms the first time she came into the store.

17.     I requested that Ryll attempt to locate security footage that was still available from MCFADDEN coming into the store when she had purchased firearms. Dana Ryll provided still photographs of security footage that showed MCFADDEN on June 16, 2020, and June 18, 2020, when she arrived alone and in a blue Hyundai Elantra with New Jersey plate Y10 HYC. I checked the registration on that vehicle and discovered that it is a rental car for P V Holding Corp (Avis Car Rental).

18.     Ryll also provided me with payment information for MCFADDEN's purchases. In summary of those firearm purchases, MCFADDEN had spent $2,765.90 on six firearms in under a month at Ryll's store alone. It should be noted that of that total, $1,118.90 was charged to two different cards and the remaining $1,647 was paid in cash. In addition, MCFADDEN also purchased multiple boxes of ammunition and gun cleaning accessories separate from her firearm transactions.

19.     Lastly, Ryll advised me that while compiling the sales data for MCFADDEN, he only then realized that she had purchased the same firearm on multiple occasions, and thought the behavior irregular.

20.     On July 23, 2020, at 4:41 PM, I was contacted by Ryll and advised that Judy MCFADDEN and an unknown male, later identified as Tyrone YOUNG, had entered Old Glory Guns & Ammo. Ryll then sent me several photographs via text message that showed YOUNG handling firearms in the store. Further, Ryll advised me that his store personnel advised that YOUNG appeared to be directing Judy MCFADDEN through her purchases as she selected several accessories to buy for firearms.

21.     Ryll also sent me a photograph of the vehicle in which MCFADDEN and YOUNG arrived. That vehicle was a gray Jeep Grand Cherokee with Kentucky license plate 040 ZMV. I had that vehicle registration checked and found the vehicle to be another rental car registered to P V Holding Corp (Avis Car Rental).

22.     At 5:51 PM, I arrived at Old Glory Guns & Ammo and started surveillance from a parking lot across the street. At approximately 6:05 PM, a uniformed police officer, later identified as Officer Jeff Giles (Townsend Police Dept.), who was unaware of the situation, arrived and entered the store. Within minutes upon the officer entering, approximately 6:08 PM, I witnessed YOUNG exit the store and use his cellphone to make an audio call. Further, I watched as YOUNG appeared to visually scan the parking lot repeatedly. After the uniformed police officer left the store and drove away, YOUNG immediately reentered the store.

23.     At 6:44 PM, I was advised by Ryll that store personnel had learned that MCFADDEN had just come from Milford Firearms and had purchased firearms there. I contacted Milford Firearms and discovered that MCFADDEN had picked up two firearms earlier

7

that day. Nick D'Augustine stated that MCFADDEN had returned to Milford Firearms on July 16, 2020, to make another purchase, and that, again, he had not received an approval or denial from the New Hampshire State Police Gun Line. Therefore, according to the federal three-day wait policy, MCFADDEN was allowed to pick up the firearm when she returned on July 23. Further, D'Augustine stated that MCFADDEN added an additional firearm to her original order when checking out, for a total of two firearms – a Glock model 21GEN4 .45-caliber pistol with serial number AEGM839 and a HS Produkt model XDM Elite 9mm pistol with serial number AT283521.

24.     D'Augustine also advised me that he could smell marijuana coming from either MCFADDEN or YOUNG and confronted them about the smell. According to D'Augustine, when YOUNG advised that he, and not MCFADDEN, had recently smoked marijuana, D'Augustine allowed MCFADDEN to continue with her firearm purchase. D'Augustine added that while in the shop, YOUNG asked for firearms to be set aside, including a derringer pistol, which they would come back and buy at another time.

25.     I requested the assistance from New Hampshire State Police and Trooper Christopher Cummings of the New Hampshire State Police, Patrolman W. Volhiem of the New Ipswich Police Department) and Officer Marc Prescott of the Mason Police Department) responded.

26.     At approximately 7:00 PM, MCFADDEN and YOUNG exited the store. I noted that YOUNG had two firearm boxes in his arms when he exited the store. When I asked YOUNG if he had firearms on him, YOUNG indicated that he only had the two firearms that were in his arms. YOUNG also added that they were MCFADDEN's firearms and he was just carrying them for her. I placed the two firearms on the roof of the rental vehicle and frisked

YOUNG for officer safety. When asked for identification, YOUNG showed me a U.S. Passport (522084599). Since at this time I had not known YOUNG's biographical information, I asked him if he was prohibited from possessing firearms. YOUNG asked for clarification on what that meant and I then asked if he was a convicted felon, and YOUNG responded that he was not. I then asked YOUNG if he had been convicted of Domestic Violence, and YOUNG also replied that he had not. Later criminal records checks on YOUNG's identity confirmed that he had no disqualifying convictions.[1] When asked I asked YOUNG where he currently lived, YOUNG responded that he lived in Brockton, Massachusetts.

27.     I advised YOUNG that he was being detained to ensure that he was not wanted by law enforcement. I then asked YOUNG to sit down so that I could speak with MCFADDEN and YOUNG agreed to do so. YOUNG was cooperative; however, I noticed that once YOUNG sat down he pulled out his cellphone. Knowing that YOUNG could delete evidence that could be found on the phone, I instructed YOUNG to hand me his phone, which he did.

28.     I then interviewed MCFADDEN away from YOUNG. I started the interview by asking MCFADDEN where she lived. MCFADDEN responded that she was moving to Texas the next day. I then asked how many firearms had she recently purchased, and MCFADDEN answered that she did not know the number, but it was "a lot." MCFADDEN seemed hesitant to answer any questions, so I asked MCFADDEN if she was in any danger from YOUNG, to which MCFADDEN responded that she was not. I advised MCFADDEN that she was not under arrest,

---

[1] Record checks did determine that YOUNG has pending charges for Operating Under the Influence of Drugs and Possession of a Class B Controlled Substance that, if convicted, would render him a prohibited possessor.

nor was she going to be arrested today. MCFADDEN indicated that she understood that she was not under arrest.

29.     I asked MCFADDEN who she was purchasing the firearms for, and MCFADDEN answered they were for herself and that she had always had a fascination with firearms. When asked where her firearms were now, MCFADDEN stated that she had two in her vehicle, and an additional two that YOUNG had carried out. When asked if she knew if YOUNG could legally possess firearms or not, MCFADDEN stated that she did not know. Further, MCFADDEN answered that two of her firearms should be in Schenectady, New York with a friend and the remaining firearms in Texas. When asked how many of her firearms where in Texas, MCFADDEN stated she did not know the number but had gone to Texas about 1 ½ weeks ago and then returned. Further, MCFADDEN stated that the firearms in Texas were at 2122 Highland Avenue in Dallas with friends. When asked if her friends in Texas could legally possess firearms, MCFADDEN again answered that she did not know. MCFADDEN also stated that the two firearms in Schenectady, New York were with her friend Tina SIMMONS, but admitted that she did not know where in Schenectady SIMMONS lived. Again, MCFADDEN stated that she did not know if SIMMONS could legally possess firearms.

30.     I then asked MCFADDEN where she had been living and MCFADDEN answered that she was moving and that her belongings were in Extra Space Storage in Framingham, Massachusetts. When asked where she had been sleeping at night, MCFADDEN admitted that she was homeless and claimed she had been sleeping in the cars she had been renting. MCFADDEN said that she was unaware that giving a false address on the ATF Form 4473 was against federal law.

31.     Additionally, MCFADDEN admitted that she was unemployed and had recently left her job at U-Haul. When asked how she could afford to buy so many firearms while being unemployed, MCFADDEN claimed that she had been using her government subsistence to buy the firearms. MCFADDEN spontaneously stated that she knows that the circumstances she had just described "look bad."

32.     I advised MCFADDEN that I knew she had been paying for the firearms with a large amount of cash and the remaining balance with cards. When asked what type of cards she had been using, MCFADDEN described them as prepaid cards that you can add money to, but not associated with a bank account.

33.     I asked MCFADDEN if she would be willing to sign a consent to search for her vehicle, so that law enforcement could seize the firearms that she admitted were in her rental car. MCFADDEN stated that she would and that she understood that she did not have to. MCFADDEN signed the attached "Voluntary Consent to Search" form.

34.     When asked if there were any drugs in her rental car, MCFADDEN answered that there might be some marijuana residue left behind from when YOUNG had smoked earlier. MCFADDEN stated that she did not use marijuana or any other type of illegal drug.

35.     I conducted a search of the vehicle. On the floorboard of the rental car, I found two glass jars filled with approximately 125.4 grams of suspected marijuana (including weight of plastic baggies). Many of the buds of marijuana were already individually wrapped in plastic bags. In the same bag as the marijuana were numerous unused baggies and two scales. I also seized the following two firearms and ammunition from the rear of the vehicle:

     a.   Ruger model Security 9 9mm pistol with serial number 383-41515.

    b.   Smith & Wesson model M&P 380 Shield EZ .380 caliber pistol with serial number NFK0380.

    c.   Ammunition removed from above listed firearms and assorted boxed ammunition.

36.    I noted during the search that several pieces of mail inside the vehicle belonged to Alecia and Jason Snyder at 2122 Highland Road #211 in Dallas, TX 75228.

37.    I also seized the two firearms that YOUNG had carried out of the store, which can be described as follows:

    a.   Glock model 21GEN4 .45 caliber pistol with serial number AEGM839.

    b.   HS Produkt (Springfield) model XDM Elite 9mm pistol with serial number AT283521.

38.    Records checks on YOUNG determined that he had no outstanding warrants. I provided MCFADDEN and YOUNG with a Receipt for Property and Other Items (ATF Form 3400.23) and explained that I was seizing both of their phones, to include YOUNG's Apple cellphone and MCFADDEN's Samsung cellphone, in order to apply for federal search warrants.

39.    On July 23, 2020, I placed both phones in a Faraday bag, which is used to block cellphone signals, before placing it into the ATF Vault located in Manchester, New Hampshire. However, on July 24, 2020, I discovered that Judy MCFADDEN's cellphone had reset to its factory setting. I then inspected Tyrone YOUNG's cellphone and it did not appear to be affected. It currently remains attached to a power source and inside a Faraday bag.

40.    I contacted S/A Matthew Ekstrom, a certified Digital Media Collection Specialist, who advised that the phone could have been remotely wiped, or reset due to overheating inside the Faraday bag. Further, S/A Ekstrom advised that no evidence would be able to be recovered from MCFADDEN's cellphone if it had been wiped back to its factory setting.

41.     On that same date, Tyrone YOUNG repeatedly called the ATF Manchester Field Office and requested that his phone be immediately returned. I again advised YOUNG that his cellphone was seized pending the application of a federal search warrant. On July 30, 2020, a federal search warrant for YOUNG's cellphone was issued in the United States District Court for the District of New Hampshire.

42.     On July 31, 2020, MCFADDEN called that ATF Manchester Field Office. During that conversation, I asked MCFADDEN where her firearms were now located. MCFADDEN advised that she had picked up the two firearms in New York and now had all her firearms in Texas. When asked how many firearms she currently possessed, MCFADDEN answered that she believed she had five firearms, but was not "100%" sure how many she had. It should be noted that MCFADDEN had purchased at least six additional firearms that are not currently in ATF custody.

43.     On August 4, 2020, I received a Confirmation of Preservation letter from Sprint advising that the records for the target number of 978-305-2589 had been located and would be preserved pending the issuance of a federal search warrant. Sprint described these preserved records as voicemails, IP connection logs, call detail records, subscriber information, and customer account notes.

## SUMMARY

44.     I know from my training and experience that straw purchasers are a major source of firearms for illegal firearms trafficking. This is because illegal firearm traffickers do not want their name directly connected to the purchase of the firearms in case they are recovered by law enforcement. Also, illegal firearm traffickers are often not legally allowed to purchase firearms, due to being legally prohibited or residing in a state where firearms are more tightly regulated.

13

That is consistent with the facts here, where YOUNG advised that he is a resident of Brockton, Massachusetts and an admitted drug user of marijuana.

45.     I know from my training and experience that straw purchasers often make purchases that are beyond their financial means because straw purchasers are not the financial source for the firearms being purchased. That is consistent with the facts here, where MCFADDEN admitted she is unemployed, homeless, and receiving government assistance; yet, was able to pay several thousand dollars for firearms in cash and prepaid cards.

46.     I know from my training and experience that straw purchasers often make duplicate firearm purchases of the same make and model of firearms. This is because straw purchasers are often given a list of what type of firearms to buy, and where a collector would try to have a varied collection of firearms, a straw purchaser is simply filling orders. That is consistent with the facts here, where MCFADDEN purchased five matching makes and models -- a pattern of purchases that Dana Ryll, an actual legal gun dealer, called suspicious.

47.     I know from my training and experience that straw purchasers are often guided inside the store by the person for whom they are buying the guns. This is because firearms are expensive and gun traffickers want to make sure that the straw purchaser is purchasing the right firearms. That is consistent with the facts here, where the store personnel inside of Old Glory Guns & Ammo stated that it appeared YOUNG was directing MCFADDEN through her purchases; and at Milford Firearms, where the owner stated that YOUNG was asking for firearms to be set aside for future purchases.

48.     I know from my training and experience that when straw purchasers are unaccompanied, they often stay in contact with that person they are buying for through their cell phone. Often, those communications occur in the form of text messages and photographs of the

14

firearms being purchased. Again, that is because gun traffickers want to insure that the correct firearms are being purchased. That is consistent with the facts here, where the owner of Milford Firearms advised that on June 26, 2020, MCFADDEN appeared to be communicating with someone via her cellphone while making her firearm purchases.

49.     I know from my training and experience that often straw purchasers and firearm traffickers will visit firearm stores before actually making firearm purchases. That is because firearm traffickers want straw purchasers to become more familiar with firearms so that their purchases seem less suspicious. That is consistent with the facts here, where Dana Ryll first recalled MCFADDEN because she was accompanied by two unknown black males but did not make any purchases on that occasion.

50.     I know from my training and experience that when confronted about the current whereabouts of their firearms, straw purchasers often have difficulty listing where their firearms are. That is consistent with the facts here, where MCFADDEN initially stated that she had an unknown number of firearms in Texas, and two firearms at an unknown location in Schenectady, New York. Then, in a subsequent interview, MCFADDEN said that she was not "100%" sure how many firearms she currently possessed.

51.     I know from my training and experience that people will often rent vehicles when they are engaged in illegal activities, like firearms trafficking and drug dealing. That is because a rental car delays identification of the driver of the vehicle by law enforcement and makes surveillance harder when the suspect's vehicle is unknown. That is consistent with the facts here, where MCFADDEN was seen in two different rental cars in a short amount of time.

52.     I know from my training and experience that people often avoid uniform law enforcement when they are doing something illegal. That is consistent with the facts here, where

15

YOUNG exited the store upon entry of a uniformed officer and then reentered the store upon his exit.

53.     I know from my training and experience that the firearms traffickers will often take possession of their firearms immediately after leaving the store. That is consistent with the facts here, where YOUNG walked out of Old Glory Guns & Ammo with firearms that MCFADDEN had purchased that day.

54.     I know from my training and experience that cellphones are used to facilitate gun trafficking. Illegal gun traffickers do not have a storefront. They often deal firearms through private transfers so that firearms cannot be tracked by law enforcement. They offer firearms for sale through pictures, often utilizing social media, which is accessible from their cellphone. They communicate with potential buyers to arrange for price and type of firearms to be purchased. That is consistent with the facts here, where I witnessed YOUNG exit the store and place a voice call while under surveillance at Old Glory Guns & Ammo.

## **TECHNICAL INFORMATION**

55.     In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Sprint subscribers may be located on Sprint's computers of Sprint.  Further, I am aware that computers located at Sprint contain information and other stored electronic communications belonging to unrelated third parties.

56.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the

subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Sprint for weeks or months.

57.       Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging."  Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Sprint for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

58.       Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

59.       Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular

17

handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

60.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

61.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing

18

digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

62.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

63.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.  Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.  This "timeline" information may tend to

19

either inculpate or exculpate the cellular device owner.  Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video).  Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

64.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Sprint to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

65.     Based on the forgoing, I submit that this affidavit supports probable cause for a search warrant requiring Sprint to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the cellular telephone number described in Attachment A, to seek the items described in Attachment B, and I request that the Court issue the proposed search warrant.

66.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

67.     The government will execute this warrant by serving the warrant on Sprint. Because the warrant will be served on Sprint, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ John R. Cook
John R. Cook
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Aug 19, 2020**

Time: **12:08 PM, Aug 19, 2020**     Andrea K. Johnstone
                                     U.S. Magistrate Judge

## **ATTACHMENT A**

This warrant applies to information associated with the cellular phone number 978-305-2589 that is stored at premises owned, maintained, controlled, or operated by Sprint, a wireless provider that accepts legal service at 6480 Sprint Parkway Overland Park, Kansas 66251.

**ATTACHMENT B**

**Particular Things to Be Seized**

I.      **Information to be disclosed by Sprint[2]**

        To the extent that the information described in Attachment A is within the possession, custody, or control of Sprint, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Sprint or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Sprint is required to disclose the following information to the government for each account or identifier listed in Attachment A:

        1.      All voice mail, text, and multimedia messages from June 3, 2020, to the present, stored and presently contained in, or on behalf of the account or identifier;

        2.      All existing printouts from original storage of all of the text messages described above;

        3.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting,

---

[2] As noted above in ¶ 43, Sprint describes the materials preserved in this account as "voicemails, IP connection logs, call detail records, subscriber information, and customer account notes." Based on my understanding of the kinds of information commonly created through wireless phone services as described in ¶¶ 55-63, Attachment B includes materials beyond what Sprint identified as being preserved (such as text messages, photographs, etc.), to ensure that if, on execution of the warrant, these additional materials are also found to be preserved associated with the account listed on Attachment A, they may be legally seized.

2

methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from June 3, 2020 to the present.

4.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message from June 3, 2020 to the present.

5.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

6.      Detailed billing records, showing all billable calls including outgoing digits, from from June 3, 2020 to the present;

7.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from June 3, 2020 to the present;

8.      Incoming and outgoing telephone numbers, from June 3, 2020, to the present;

9.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

10.     All records pertaining to communications between Sprint and any person regarding the account or identifier, including contacts with support services and records of actions taken.

3

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 922(a)(6) 924(a)(1)(A), and involving Judy MCFADDEN and/or Tyrone YOUNG from June 3, 2020, to the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      The straw purchase of firearms;

b.      Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

c.      Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

d.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

e.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

f.      The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the straw purchase of firearms, including records that help reveal their whereabouts.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by Google, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

Google.  The attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Google, and they were made by Google as a regular practice; and

b.      such records were generated by Google's electronic process or system that

produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original

records; and

2.      the process or system is regularly verified by Google, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                 Signature